It's good to see you again, Your Honors. Yesterday I was here on a social security claim and I was asking you to vacate a decision of Administrative Law Judge Michael Cianci on behalf of James Osborne. Today I'm here to ask you to vacate the decision of ALJ Michael Cianci's lawyer, James Osborne, on behalf of James Osborne. behalf of Deborah Castillo. Ms. Castillo applied for her disability benefits back in 2003. The medical records show that she has a psychiatric impairment. She receives treatment at a state agency facility called Teros. She's had a period of homelessness. She cuts herself. She'll cut both arms. She uses a knife to cut herself or else she'll use a can opener, a military type can opener. She's been moody. She's irritable. She has a difficult time maintaining emotional ability. And her nurse practitioner at Teros basically set forth a number of restrictions and limitations indicating that Ms. Castillo would have a difficult time dealing with work stress and things to that effect, maintaining emotional ability, dealing with coworkers and supervisors. So social security in trying to ascertain the extent of the psychiatric impairment had Ms. Castillo examined by their own psychologist. The psychologist diagnosed a personality disorder as well as a depressive disorder. And he writes in his report that due to this personality disorder, Ms. Castillo would have difficulty maintaining long-term employment. And that's actually demonstrated by her past earnings record. It's very sporadic. Dr. Bencomo will find that the claimant would be seriously limited in her ability to maintain emotional stability, maintain reliability, be predictable in social situations and deal with work stress. Judge Cianci said that after reviewing the evidence, he gives probative weight to the opinion of the consulting psychiatrist. However, he then assesses a patient's ability to live, low stress work, with no high production quotas and no confrontational roles. There's no way anyone could look at this record and figure out where he came up with those restrictions and limitations. Dr. Bencomo doesn't say that. The treating nurse practitioner doesn't say that. What they appear to do is pick and choose from reports from non-examining, non-consulting physicians who basically checked off boxes and didn't even have all of her medical records. That's not the way we evaluate Social Security disability claims and the way to be afforded to the opinion of treating physicians and examining consulting physicians. When we look to reject that kind of probative evidence and try to rely on non-treating, non-examining consulting physician evidence, we have to look for clear and convincing reasons. And there were just none. In fact, he says he accepts it. So if he accepts it, how can he find a reason that she does not have a problem for long-term employment, when those are the exact words of that psychologist? And then to further confuse the issues, he attempts to find my client not credible. And what he does in this respect is pretty astonishing, because one of the things he says is she's not credible because she's able to demonstrate activities that one would consider to be inconsistent with disability. One of the activities that he mentions is she sees her doctors. He finds that because she sees her doctors, where she can go to her doctors, she can't be disabled. That's two inconsistent things. Well, if she doesn't go to a doctor, she's not disabled. She goes to a doctor, she's not disabled. It's a catch-22 type situation. He says that my client's not credible by demonstrating an ability to work because she lives with her boyfriend. She was homeless. In fact, when she was homeless, she went to the psychiatric facility Teros and was on a day program where she would get her meals and they would provide her counseling. So she lives with somebody. He finds that inconsistent with disability. It doesn't make sense. He says what's inconsistent with disability is that she could stay home and paint rocks and do crafts. That doesn't show that she's not emotionally unstable, that she can't deal with work pressures. He says that she's able to prep meals, cook, care for cats. I mean, the case law is very clear when we look at Regenerator and FAIR. You've got to be talking about activities that transfer to a work setting. And here, none of these activities that he identifies is inconsistent with disability. I would suggest that there are many people that are psychologically impaired that maybe can play with a cat, actually live with somebody, go to a doctor and get treatment, but can't sustain work. She's had a very troubled childhood. You can see in this case that she's had a very troubled childhood. And the record, a stepfather verbally abused her. There's an indication that she was sexually abused. She has difficulty maintaining employment. And we wonder how the administrative law judge is able to interpret the record to come to the conclusion that he did. And if we look at the words that he used, he says, well, on medication she improved. And he cites to a two-month period of time where there was some improvement with medication. That's not the type of improvement that he's talking about. He's talking about a month before when she was cutting herself, when she was in distress, when she was emotionally irritable. And look, after that two-month period, again, irritability, problem sleeping. My client testified that she feels safer during the day. So she doesn't sleep well at night. And during the day she's tired and that's when she can rest. The records show that she has a tough time getting along with other people. There's just no job that such an individual would be able to sustain. And when we look at Social Security's definition of disability, it's eight hours a day, five days a week, on a regular and consistent basis. And there's really no evidence that my client would be able to sustain that. She did everything she could. She got into the state agency facility. She took her medications. She went to counseling. Was there some improvement with medications? There was some improvement with medications. Was it sustained or was it consistent? No. And the records clearly show that. In fact, just I think it was a month prior to her hearing she was cutting her arms. A vocational consultant testified that if somebody's there cutting their arms, they can't work. And that's really what this case comes down to. It's a very consistent record. She did everything she could. And so what we're asking you is to find that and to the examining consulting physician and how we twist that into a conclusion that the claimant could work is not supported by substantial evidence of record. There's not a clear and convincing rationale. And we would ask that you credit the nurse practitioner's restrictions and limitations, credit the psychiatric reports that we have, and credit Dr. Bencomo, their own doctor who says that the individual would be unable to hold down a steady job. I would also ask that you find my client credible. When you read her transcript, she basically tells you how it is. There's nothing there that's inconsistent. There's nothing there of any exaggeration, any malingering under the cotton standard. Again, clear and convincing reasons are needed to find the claimant not credible. I would submit to you that her ability to go to her doctor's appointments, her ability to play with cats, her ability to live with a boyfriend, who she said, she rarely goes out alone. She usually has someone with her. These are not activities that evidence disability. And I would ask you to reverse that finding. Credit claimant's testimony is true. Thank you. Thank you. Good morning. I'm Ann Mailey. I represent the Commissioner of Social Security. I want to address some of the points that appellant raised. First, concerning Dr. Bencomo, the consultative examiner, the ALJ's RFC, the functional assessments the ALJ made about what the claimant could do addressed Dr. Bencomo's limitations. The ALJ found that the complainant could do a simple job with low production quotas, no confrontational roles, and low stress. And if you look... Can you conclude she could be an electronics assembler or a fast food worker? An electronics assembler, Your Honor, yes. Didn't say fast food worker? No, it was an electronics assembler. Fast food was discussed, but ultimately the vocational expert testified that even with all of the limitations that Dr. Bencomo assessed, that the claimant could still perform her past work as an electronics assembler, the vocational expert also testified that this was a job that did not involve working with people. It was not a social job. And so the ALJ took into account Dr. Bencomo's limitations and the vocational expert heard all of the limitations from Dr. Bencomo and still found that she could perform her past relevant work. It's also important to point out that Dr. Bencomo assessed the claimant in 19 different areas. Do you want to get some water? Okay. Thanks, I'm getting over a cold. And in these nine different work areas, he assessed that the claimant was not limited in three areas. He rated her as good in two areas, as good to fair in six areas, and as fair in four areas. And again, things like having problems with work stress, behaving emotionally, being in a bad mood. Relating predictably in social situations, these are all things that are accounted for in the residual functional capacity, what complainant could still do despite her impairment. Now, regarding the medical evidence that a panelist talked about at TOROS, I'm going to talk about the ALJ's reasons for rejecting the training nurse's opinion. In two documents found that the opine that the claimant could not work. One document in March of 2004 simply is a handwritten note that's saying she can't work. She doesn't assess any functional limitations. She's not even a physician. She doesn't explain why the claimant can't work with any specificity. The second time she claims that the claimant can't work is a few months later in July of 2004, and this time it's a checkbox form. The checkbox form says it's supposed to be accompanied by a report, but it's not. It simply says she's limited in all areas. Now, the ALJ found that if you look at the two-year treatment records and take a longitudinal view and track out her treatment records from March of 2005, she went to TOROS about twice a month, that those records are inconsistent with the finding of disability. You'll note from the records that in May of 2003, she came into TOROS. She was having problems cutting herself. She hadn't been taking her medication. She hadn't been treated for six months, but then after that she was put on medication and she stabilized, and there was a five-month period where at worst she complained of irritability and problem sleeping. Then again, she had about a month where she had some problems, apparently some problems with medication. Then after that she's back on medication, six months period where she's relatively stable. Again, her worst complaints are irritability and problem sleeping. Then there's another seven-month period up until the end of the treatment records in April of 2005, where the claimant does not have significant problems functioning. So Nurse Pence's opinion that the claimant is disabled, it's her only medical evidence, is not supported by the overall evidence. The appellate has asked that the ALJ isolate areas where there are problems, but it's the ALJ's job to look at the record as a whole, and it's the ALJ's job, not the treating nurse or Dr. Vencomo, to indicate what the residual functional capacity is. I also wanted to address credibility. Now the ALJ didn't find that the claimant wasn't credible because she could play with her cats or because she had a boyfriend. The ALJ found that her activities were inconsistent with her statement that she can't work because she can't be around people because it stresses her out too much. So despite the fact that she says she can't be around people, it's too stressful, she testified that she socializes with people, that she's had a boyfriend since 2001. She takes care of a disabled friend on a weekly basis. She goes to the library, she goes to the grocery store, she puts herself in situations where she's around people. Now not only is the electronics job not a job that involves a lot of people, and not only did the ALJ account for this in the RFC by making sure she didn't have to be in social situations, it's pretty clear that at least with regard to her allegation that, or her claim that she has a problem being around people, she certainly spends a lot of time around people and she seems to function fine. But that was not the only reason for the ALJ's discounting Claimant's credibility. He also found that the medical records show that she was stable on medication, and the record does show that, substantial evidence supports that finding. Claimant's own nurse, Nurse Pence, stated that she improved on medication, and in an interview in November of 2003 with a disability representative, Nurse Pence said that she was pretty much back to normal, having improved on medications. Dr. Vancomel also said that despite all the problems, the complainant, excuse me, the claimant... If she goes off her medication periodically and then is not functional, what does that do, what kind of a finding should that lead to? Sure, well, the Ninth Circuit case law, I cited some of these cases in my brief, where W.A., R.R.E., O'Dell, and Crane say that if an impairment can be controlled with medication, it's not disabling. And so there's nothing indicating that her impairment causes her to stop taking medication, she's just testified that she doesn't always like taking it, but that's not a reason to find her disabled. In fact, from a policy standpoint, it wouldn't be appropriate to encourage people not to take their medication if they were found disabled, because they couldn't take their medication for some reason. And the case you cited for that proposition, I'm not surprised that there's some such case, but I just wondered what it is, which one. Oh, about the policy that I just... I was inferring that from the cases, but there are cases that say that if an impairment can be controlled with medication, it's not disabling, where W.A., R.R.E., versus Commissioner O'Dell v. Heckler, and also Crane v. Shalala, and those are in my brief. I wonder, I suppose some people are sufficiently disabled mentally that they won't consistently take the medicine that they really need. Sure, and there's a case... where the claimant's impairment caused her to be unable to take her medication. Well, there are cases where the medication for those who are emotionally or psychologically at risk find that the side effects of a particular medication are worse than the problem that they're facing. And I'm thinking in particular of one case that I recall where they became very, very sleepy and wanted to sleep all day long. And so, therefore, they just stopped taking their medication. So how do we deal with something like this? The record doesn't show that the claimant was so sleepy that she couldn't engage in daily activities. One of the reasons that the ALJ... Well, first of all, there is evidence that she did have some problems being drowsy at times, but she also had problems not being able to sleep, and it's unclear whether that was caused by her medication. But the record also shows that the claimant could do a number of daily activities, and the ALJ talked about those. She talked about drawing and painting and making jewelry and going to the library, gardening, doing grocery shopping, vacuuming, socializing, going out, riding the bus, things like that. So she certainly wasn't laying around all day sleeping. I see that my time is up. So in summary, substantial evidence supports the ALJ's conclusion that the complainant could do her past work and would emphasize focusing on the medical records from TORAS which don't show that the claimant was disabled when you look at the longitudinal view of those records. All right, thank you, counsel.
judges: Canby, Wardlaw, Mills